**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **RONALD JOHNSON, o/b/o J.J.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 2:14cv0093 TCM** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final

decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner),

denying the application filed on behalf of J.J. (Plaintiff) by his father, Ronald Johnson, for

supplemental security income benefits (SSI) under Title XVI of the Social Security Act (the

Act), 42 U.S.C. § 1381-1383b, is before the undersigned Magistrate Judge for final

disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

### Procedural History

Mr. Johnson applied for SSI on Plaintiff's behalf in September 2011, alleging Plaintiff

was disabled as of September 12, 2010, when he was ten years old, due to Attention Deficit

Hyperactivity Disorder (ADHD); difficulty concentrating; difficulty sitting still; being

disruptive, defiant, and occasionally violent; and having trouble keeping friends. (R.[1] at 130-

---

[1]References to "R." are to the administrative record electronically filed by the Commissioner with
her answer.

38, 160.)  This application was denied initially and following an administrative hearing held in April 2013 before Administrative Law Judge (ALJ) Ken H. Chau.  (Id. at 8-28, 44-77, 80-84.)  The Appeals Council denied a request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff and Mr. Johnson testified at the administrative hearing.  They were represented by counsel.

Plaintiff testified that he is in the seventh grade.  (Id. at 49.)  He is "doing pretty good" in school and is passing some of his classes.  (Id.)  His favorite subject is math.  (Id.)  He has "a lot" of friends at school, but does not hang out with them after school.  (Id. at 50.)  He has friends at home that he plays with.  (Id.)  He likes to play football, ride bikes, barbeque, go for walks, and play video games.  (Id.)  He plays the video games online with other people. (Id.)

Plaintiff has to sit in front on the school bus because otherwise he gets into trouble. (Id. at 52.)  He will be allowed to go to the back if he doesn't get "any referrals."  (Id.)  There was a time when he was not allowed to ride the bus.  (Id.)  Also, he has been sent to off-base (the high school) suspension twice because he got into a fight.  (Id. at 52-53.)  He gets angry whenever anyone talks about someone in his family.  (Id. at 53.)  Almost every day he gets into a dispute with a specific teacher.  (Id.)  About twice a week, he has to leave the classroom.  (Id.)  When he is angry, he refuses to do his homework.  (Id.)  This occurs

approximately twice a month.  (Id.)  Approximately once a week, he forgets to turn in his homework.  (Id. at 54.)

Plaintiff takes medicine for ADHD:  Vyvanse, Concerta, and Kapvay.  (Id.)  He also takes clonidine[2] and melatonin.  (Id.)  He takes medication every morning.  (Id. at 55.)  If "it gets in his system early," he does not get into trouble on the bus.  (Id.)  As the medication wears off during the day, he gets into more trouble.  (Id.)

Plaintiff also takes medication for sleeping.[3]  (Id.)  The length of time before it is effective varies.  (Id. at 56.)  He has trouble getting up in the morning and, approximately once a month, has trouble getting to school.  (Id.)  If he misses any more school without an excuse, he will be on probation.  (Id. at 57.)

Plaintiff sees his doctor, Dr. Derlukiewicz, once a month.  (Id.)  He talks with a counselor, Kate Whitehead, about every other week.[4]  (Id.)

Mr. Johnson testified that Plaintiff has switched to Vyvanse from Concerta.  (Id. at 60.)  He is sometimes called to pick up Plaintiff at school because he is sleeping.  (Id. at 61.)  He sometimes has to force Plaintiff to take his medications, i.e., he watches him take them and makes sure he swallows.  (Id. at 61-62.)

---

[2]As illustrated by Plaintiff's medical records, he would not be taking Kapvay and clonidine at the same time because Kapvay is a brand name for clonidine.  See Clonidine, http://www.drugs.com/clonidine.html (last visited July 23, 2015).

[3]Melatonin is prescribed to treat insomnia.  See Melatonin, http://www.drugs.com/melatonin.html (last visited July 23, 2015).

[4]Plaintiff's counsel later informed the ALJ that Hannibal Regional Medical Group would not release Ms. Whitehead's records on policy grounds.  (Id. at 364.)

Plaintiff has good days and bad days.  (Id. at 62.)  Approximately once or twice a month, Mr. Johnson gets a phone call from Plaintiff's teachers about him sleeping or having difficulties with other children.  (Id. at 63.)  He is also called when Plaintiff disrupts classes.  (Id. at 69.)  Mr. Johnson has trouble getting Plaintiff to follow his rules.  (Id. at 64.)  For instance, Plaintiff has to be reminded again and again to take out the trash and is threatened with having his game taken away or not being allowed to go fishing with Mr. Johnson.  (Id.)  Currently, Plaintiff is not allowed to ride the bus for two weeks.  (Id. at 65.)  Asked what happened to get him kicked off, Mr. Johnson explained that it was "[n]othing really."  (Id.)  The bus driver has had trouble with all seven of Mr. Johnson's children.  (Id.)

Plaintiff sometimes fights with the brother who lives with them.  (Id. at 66.)  Plaintiff does not like being corrected; he gets frustrated and kicks or throws things.  (Id.)  If he goes outside, he gets over it in about thirty minutes.  (Id.)  Plaintiff does not have any problem with other people's property, but sometimes steals change from Mr. Johnson.  (Id. at 67.)  One time, Plaintiff took his truck and turned it on its side.  (Id.)

Plaintiff does not like to shower or brush his teeth.  (Id. at 68.)

### Medical, School, and Other Records Before the ALJ

The records before the ALJ included reports completed as part of the application process, school records, and medical records.

On a Function Report form for children ages twelve to eighteen, Mr. Johnson reported that Plaintiff does not have any problems seeing or talking clearly, but does have problems hearing due to tubes in his ears.  (Id. at 148-49, 150.)  He is not sure if Plaintiff's daily

activities are limited. (<u>Id.</u> at 150.) Plaintiff does not have any limitation in understanding other than refusing to do something he does not want to do. (<u>Id.</u> at 151.) His physical abilities are not limited. (<u>Id.</u>) Plaintiff can make friends, but will frequently fight with them and then lose them. (<u>Id.</u> at 152.) He needs to stay on his medications. (<u>Id.</u>) Plaintiff will wash and put away his clothes if he wants to. (<u>Id.</u> at 153.) He can take care of his personal hygiene, e.g., brush his teeth and comb his hair. (<u>Id.</u>) He avoids accidents and, with Mr. Johnson's help, gets to school on time. (<u>Id.</u>) Plaintiff needs reminders to finish his homework. (<u>Id.</u> at 154.)

Plaintiff's school records include a report listing twenty-one violations of school rules between September 2011 and February 2012. (<u>Id.</u> at 243-46.) These violations ranged in severity from excessive tardiness and disrespectful behavior to vandalism and fighting. (<u>Id.</u>)

For grades three through six, Plaintiff's scores on the Missouri Assessment Program (MAP) tests were all at the "Proficient" level with the exception of being at the "Basic" level in Science in the fifth grade. (<u>Id.</u> at 261.)

One of Plaintiff's sixth grade teachers, Paula Epter, completed a Teacher Questionnaire on his behalf. (<u>Id.</u> at 177-86.) She had known him for three months and saw him, and twenty-seven other students, every day for ninety minutes for instruction in English and reading. (<u>Id.</u> at 177.) He did not have an unusual degree of absenteeism. (<u>Id.</u>) She did not observe him having any problems in the domains of acquiring and using information, interacting and relating with others, moving about and manipulating objects, or caring for himself. (<u>Id.</u> at 178, 180-82.) He did have problems in the domain of attending and

completing tasks.  (Id. at 179.)  Specifically, he had a serious problem in six of the thirteen listed activities and an obvious problem in four.[5]  (Id.)  She noted that "[Plaintiff] is very capable and responds to structure in the classroom.  He works best with one-on-one attention.  [He] is bright and reads on level."  (Id.)  Ms. Epter did not know if Plaintiff had been prescribed, or took, any medication.  (Id. at 183.)  She did know that he did not frequently miss school due to illness.  (Id.)

On a separate form, Ms. Epter reported that Plaintiff was at his grade (sixth) level in reading, math, and written language.  (Id. at 190.)  His grades that year after the first semester were Cs in four subjects (Keyboarding, Chorus, Math, and World Geography), Ds in three subjects (English, Science, and Reading), and a B in Physical Education.  (Id. at 265.)  It was noted that absences were the primary cause of the low grade in Science.  (Id. at 237.)  He was present 62.91 percent of the time.  (Id. at 269.)  His grades at the end of the first semester of seventh grade included two As (both in non-academic subjects),  three Cs (in Science, Math, and World Studies), two Ds (in Educational Technology and Reading), and one F (in English).  (Id. at 262.)

In December 2011, a school counselor, Michael Blase, also completed a questionnaire.[6]  (Id. at 212-15.)  This questionnaire did not ask that Plaintiff's degree of

---

[5]The teacher did not rate how well Plaintiff did in the other three activities.

[6]Mr. Blase completed the questionnaire again in January 2012.  (Id. at 232-35.)  Mr. Blase then noted that Plaintiff performed at average achievement levels and, therefore, did not have an Individualized Education Plan (IEP).  (Id. at 233.)  He would act like a clown to gain peer approval; this occurred primarily at unstructured times, i.e., lunch, but would occasionally occur in class.  (Id. at 232.)  He was currently in an off-campus suspension program for a recent rule infraction, and often had to be

limitation in the various domains be rated; rather, it requested narrative descriptions of how Plaintiff was functioning in specific ways. Mr. Blase had known Plaintiff for four months. Plaintiff did not have any physical problems but did have ADHD, for which he took Concerta daily at school. (Id. at 212.) Mr. Blase reported that Plaintiff "has extreme difficulty in following set guidelines and rules. He has been disciplined numerous times for his infractions both on the bus and at school." (Id.) Although he took medication, he continued to make poor decisions and cause disruptions. (Id.) Mr. Blase further noted that Plaintiff was "quite intelligent" and, when not being disruptive, could "be a solid contributor to the lesson." (Id. at 213.) "Numerous adaptations" were employed to keep Plaintiff on task. (Id.) "[Plaintiff] interacts with adults and peers quite easily. However, he often makes inappropriate statements to [attract] negative attention . . . ." (Id. at 214.) Plaintiff was then passing seven of his eight classes. (Id. at 215.)

Also in December 2011, the same questionnaire was answered by Plaintiff's sixth math teacher, Angie Odom. (Id. at 217-20.) Her answers were consistent with those given by Mr. Blase.

Plaintiff's former fifth grade teacher, Kristin Doyle, submitted a completed, undated questionnaire. (Id. at 256-59.) As did Ms. Odom and Mr. Blase, Ms. Doyle described Plaintiff as having problems staying on tasks, completing class work and homework, and

---

isolated to prevent him from distracting himself or the rest of the class. (Id. at 233.) "Most of [Plaintiff's] interactions with peers are conflictual in nature." (Id.) Mr. Blase has not observed any deficiencies in Plaintiff's ability to focus, concentrate, or attend to tasks, but was basing his opinions on teachers's reports. (Id. at 234.)

getting along with others.  (Id. at 256, 258.)  He often came to school looking "'disheveled'" and sometimes wore unclean clothes.  (Id. at 258.)  She also described him as intelligent with an ability to mentally calculate problems but resistant to pencil and paper activities.  (Id. at 259.)

Michael Skeen, the Director of Transportation for the school district, reported that Plaintiff does not follow instructions, stay focused on staff's requests, or understand the impact of his actions on others, safety, or the bus.  (Id. at 222.)  He opined that Plaintiff needed to take his medications early enough that they were of help when he was on the bus.  (Id.)  He thought Plaintiff's behavior improved when he took his medications.  (Id.)  Mr. Skeen further reported that Plaintiff had demonstrated this behavior for years.  (Id. at 223.)  When on the bus, Plaintiff will respond briefly to a request and then continue in his behavior.  (Id. at 224.)

Also in December 2011, Clinton Johnson, a brother of Plaintiff's, answered the same questionnaire as did Mr. Blase, Mr. Skeen, and Ms. Odom. (Id. at 227-30.)  He reported that Plaintiff cannot focus, carry on conversations, make friends, or stay on task.  (Id. at 227.)  When he takes his medication, Plaintiff continues to have violent outbursts but is not rude and listens and cooperates better.  (Id. at 227, 228.)  Plaintiff needs special tutoring.  (Id. at 228.)  He cannot relate to others "because his mind is going a hundred miles per hour."  (Id. at 229.)  Plaintiff has had tubes in his ears since he was eight and often gets headaches.  (Id.)

Plaintiff's medical records, primarily those of Katarzyna Derlukiewicz, M.D., are summarized below in chronological order.

Plaintiff began seeing Dr. Derlukiewicz in July 2010 for medication management. (Id. at 302-03.) He had been seeing a Dr. Nichols. (Id. at 302.) Plaintiff was feeling well, and had no loss of appetite or weight and no decrease in sleep. (Id.) His compliance with his medication was inconsistent in the summer. (Id.) He was unable to concentrate, irritable, and hyperactive; he would not mind others. (Id.) He was not depressed and did not demonstrate abnormal movements, mood changes, or compulsive behavior. (Id.) He was diagnosed with ADHD, combined type; oppositional defiant disorder (ODD); and circadian rhythm sleep disorder, delayed sleep phase type. (Id. at 303.) He was prescribed Concerta and clonidine and was to return in two weeks. (Id.)

When Plaintiff next saw Dr. Derlukiewicz, six weeks later, he was compliant with his medication. (Id. at 304-05.) The following were not present on a review of his systems: abnormal movement, depression, inability to concentrate, mood changes, school stress, irritability, discipline problems, hyperactivity, and compulsive behaviors. (Id. at 304.) Dr. Derlukiewicz noted that Plaintiff's medication compliance had a good effect on his behavior and attention span and on his sleep. (Id. at 305.) He was well-dressed and groomed, demonstrated mild psychomotor agitation, was cooperative, had good eye contact, and had a good mood. (Id.) His speech was average; his thought process was logical and goal-directed; his insight and judgment were adequate to his age. (Id.) He was alert and oriented to time, place, person, and situation. (Id.) He had improved, was continued on his medications, and was to follow-up in one month. (Id.)

Two and one-half months later, on November 15, Plaintiff again saw Dr. Derlukiewicz, reporting that he had a headache and heartburn.  (Id. at 306-07.)  His father reported that Plaintiff had been doing well at home and school.  (Id. at 307.)  There were no academic or behavior problems.  (Id.)  Plaintiff had moderate psychomotor agitation; he had run out of Concerta.  (Id.)  On examination, he was as before.  (Id.)

On December 14, Dr. Derlukiewicz noted that Plaintiff's teacher's responses to a questionnaire indicated that he was struggling with poor attention span and had difficulty sitting still.  (Id. at 308-09.)  His grades were deteriorating due to his failure to return assignments and to not being organized.  (Id. at 308.)  There were no other concerns or complaints.  (Id.)  Plaintiff's dosage of Concerta was increased.  (Id.)

Plaintiff was seen on January 5, 2011, by Kevin B. Imhof, D.O., for complaints of recent drainage from his left ear.  (Id. at 284.)  Dr. Imhof noted that Plaintiff was status post placement of ventilation tubes, diagnosed him with left otitis media with effusion, and prescribed an antibiotic, Bactrim.  (Id.)  Plaintiff was to return in one month for a recheck, but did not.

At his next, February 21 visit to Dr. Derlukiewicz, Plaintiff was accompanied by his twenty-one year old brother.  (Id. at 310-11.)  The brother reported that Plaintiff was doing better at home and at school on the increased dosage of Concerta.  (Id. at 310.)  Dr. Derlukiewicz observed moderate psychomotor agitation, noting that Plaintiff had not taken his medication that day.  (Id.)  Otherwise he was as before.  (Id.)

When Plaintiff was seen by Dr. Derlukiewicz on March 23, Mr. Johnson reported that he was doing well at home and school and was tolerating his medications well, but he was having problems falling asleep even when taking clonidine.  (Id. at 312-13.)  Melatonin was added to his medications for his sleep disorder.  (Id. at 313.)  Plaintiff was to follow-up in one month.  (Id.)

Plaintiff was seen in July at the Hannibal Regional Hospital emergency room for complaints of throbbing pain in his right foot after tripping at home.  (Id. at 289-99.)  X-rays were negative.  (Id. at 293, 297.)  Plaintiff was diagnosed with a sprain of his right foot.  (Id. at 293, 298.)  The foot was wrapped in an ace bandage.  (Id. at 292.)  Crutches were ordered for Plaintiff and he was discharged home.  (Id. at 292, 296, 298.)

Plaintiff returned to Dr. Derlukiewicz on September 14.  (Id. at 314-15.)  She noted that she had last seen Plaintiff six months earlier and that he had missed his monthly appointments until then.  (Id. at 315.)  Mr. Johnson reported that Plaintiff "ha[d] been having 'mood swings' and he [was] planning to obtain SSD for him."  (Id.)  "[Plaintiff] reported feeling very restless, fidgety, impatient, with short fuze . . . , rushing through his assignments, very talkative."  (Id.)  He was having trouble organizing himself.  (Id.)  His dosage of Concerta was increased in order to "subside the [symptoms]."  (Id.)  Dr. Derlukiewicz discussed with Plaintiff and his father the need to keep the monthly appointments in order to optimize his treatment and to safely continue the medication management.  (Id.)  Mr. Johnson agreed.  (Id.)

One month later, Mr. Johnson reported to Dr. Derlukiewicz that Plaintiff was doing better on the increased dosage of Concerta, but would forget to take it four days out of seven. (Id. at 316-17.) When he misses a dose, he is "very impulsive, irritable, gets into trouble a lot." (Id. at 317.) "Also [Mr. Johnson] for some reason has been giving him Clonidine at 6PM and he falls asleep and sleeps till 3 AM." (Id.) Because he was falling asleep early, he was not completing his homework. (Id.) Dr. Derlukiewicz recommended changing the time of the clonidine administration to 8 o'clock in the evening and making the school responsible for the medication management. (Id.) On examination, Plaintiff was as before. (Id.)

At the November 14 visit to Dr. Derlukiewicz, Mr. Johnson reported that Plaintiff had not being doing well at school. (Id. at 332-33.) He had been forgetting to take his Concerta at home and, also due to forgetfulness, at school. (Id. at 333.) Mr. Johnson had not changed the time he gave Plaintiff the clonidine; consequently, Plaintiff was still waking up at 3 o-clock in the morning. (Id.) Plaintiff was to be given the melatonin at 7 o'clock in the evening. (Id.) On examination, Plaintiff was as before. (Id.)

Plaintiff was seen by Larry Nichols, D.O., on December 7 for cold symptoms that had lasted longer than a week; was diagnosed with infectious rhinitis and early bronchitis; and was prescribed an antibiotic. (Id. at 324.)

Plaintiff reported to Dr. Derlukiewicz on December 14 that he was getting his Concerta at school "with some improvement in his behavior." (Id. at 334-35.) Mr. Johnson "reported that [Plaintiff] ha[d] been doing well at home, goes to bed at 9PM and gets up at 6AM. He started stealing cigarettes and smoking them." (Id. at 335.) Dr. Derlukiewicz

noted that teachers's responses to a questionnaire "indicated a lot of behavior issues/defiance" and thought those issues might have arisen when Plaintiff was noncompliant with his medications and was not sleeping properly." (Id.) There were no changes in the examination findings. (Id.)

Plaintiff returned to Dr. Nicols in January 2012 for treatment of a cough and congestion. (Id. at 325.) He was diagnosed with early bronchitis/sinusitis and prescribed antibiotics. (Id.)

On February 7, Mr. Johnson reported to Dr. Derlukiewicz at Plaintiff's visit that Plaintiff was not doing well at home or school and that his behavior was much worse when he did not take Concerta. (Id. at 336-37.) Kapvay, a non-stimulant ADHD medication, was added to Plaintiff's prescriptions and was to be taken twice daily. (Id. at 337.) Plaintiff was to follow-up in two weeks. (Id.)

On February 27, Plaintiff was reportedly doing better at home and school since beginning to take the Kapvay; however, due to a misunderstanding, Plaintiff was taking only half the prescribed dosage. (Id. at 338-39.) He was going to start taking the correct dosage. (Id. at 339.) Dr. Derlukiewicz prescribed a slowly-decreasing dosage of clonidine. (Id.)

In March, Plaintiff was doing "very well at home and school" and was not having any academic or behavior problems. (Id. at 340-41.) He was tolerating his medications well and was continued on them. (Id. at 341.) On examination, he was as he had consistently been. (Id.)

On April 30, Mr. Johnson reported to Dr. Derlukiewicz Plaintiff was doing well at home and school as long as he took his medications. (Id. at 342-43.) He was having some problems falling and staying asleep. (Id. at 343.) He was to return in one month. (Id.)

At the next, July 19 visit, Plaintiff was doing well; he has passed all his subjects and been promoted to seventh grade. (Id. at 344-45.) He had run out of his medications. (Id. at 345.) Dr. Derlukiewicz described him as stable when he takes his medications. (Id.)

On July 31, Plaintiff was again described as doing well as long as takes his medications. (Id. at 346-48.) He was going to bed very late and waking up in the afternoon. (Id. at 347.) His sleeping habits were discussed. (Id.)

When next seeing Dr. Derlukiewicz, on September 13, Plaintiff was doing well and taking his medications as prescribed. (Id. at 349-50.)

On October 18, Mr. Johnson reported to Dr. Derlukiewicz that, due to poor grades, Plaintiff was living with Mr. Johnson's adult son so the son could help Plaintiff with his school work and provide more structure. (Id. at 351-52,)

Plaintiff was accompanied by his sister-in-law to his November appointment with Dr. Derlukiewicz. (Id. at 353-54.) The sister-in-law reported that Plaintiff had been doing well at home and school and was not having behavior or academic problems. (Id. at 354.) Plaintiff was continued on his medications. (Id.)

When seen by Dr. Derlukiewicz in January 2013, Plaintiff was again living with his father. (Id. at 355-57.) Dr. Derlukiewicz noted that Plaintiff should have run out of his

medications a month earlier and discussed with him his poor medication compliance.  (Id. at 355.)  His grades had fallen in December. (Id.)

At the February 18 visit, Plaintiff's symptoms were "short attention span, impulsive behavior, hyperactive behavior, easy distractability, poor listening, forgetfulness, careless mistakes, losing things, avoiding mental effort tasks, difficulty remaining seated, difficulty playing quietly, fidgeting, excessive talking, difficulty awaiting turn, interrupting others, academic underachievement and conflict with parents."  (Id. at 358-60.)  Mr. Johnson described the symptoms and severe and unchanged.  (Id. at 358.) Dr. Derlukiewicz described them as moderate in severity, improving, exacerbated by sleep deprivation, and relieved by consistent rules.  (Id.)  "By report there is fair compliance with treatment, fair tolerance of treatment and fair symptom control."  (Id.)  Plaintiff was playing video games at night, sleeping little, and then falling asleep in the classroom or being so tired he could not focus. (Id.)  Dr. Derlukiewicz recommended limiting video games to one-half hour per day, particularly on school days, and a proper sleep routine.  (Id. at 358, 360.)

The next day, Dr. Derlukiewicz completed a Medical and Functional Capacity Assessment on Plaintiff's behalf.  (Id. at 326-31.)  She described the symptoms supporting her diagnoses of ADHD, ODD, and circadian rhythm sleep disorder as problems with focusing, impulsivity, restlessness, argumentativeness, oppositional defiance, and significant difficulties falling asleep.  (Id. at 326.)  Plaintiff's impairments had, or could be expected to, last at least twelve months.  (Id.)  Assessing the degree of limitations caused by his impairments, Dr. Derlukiewicz checked that Plaintiff had marked limitations in the domains

of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself.  (Id. at 328-30.)  He had no limitations in the domain of moving about and manipulating objects and moderate limitations in the domain of health and physical well-being.  (Id. at 329-30.)  For each domain in which Plaintiff had marked limitations, Dr. Derlukiewicz noted that Plaintiff's difficulties arose when he was not on medications.  (Id. at 328-30.)

In March, Plaintiff was described as doing well at home but not at school.  (Id. at 361-63.)  Mr. Johnson reported that Plaintiff was compliant with his medication 90 percent of the time.  (Id. at 361.)  The effectiveness of the medications varied.  (Id.)  Concerta was stopped; Vyvanse was added.  (Id. at 363.)

Also before the ALJ was a Childhood Disability Evaluation Form completed in October 2011 by a non-examining consultant, Terry Dunn, Ph.D.  (Id. at 318-23.)  Plaintiff's impairments were ADHD, combined type; ODD; and circadian rhythm sleep disorder.  (Id. at 318.)  These impairments were severe, but were not so severe as to meet or medically equal an impairment of listing-level severity.  (Id.)  Specifically, Plaintiff was found to have no limitations in the domains of acquiring and using information, of moving about and manipulating objects, and of health and physical well-being; less than marked limitations in the domains of interacting and relating with others and of caring for himself; and marked limitations in the domain of attending and completing tasks.  (Id. at 321-021.)

**The ALJ's Decision**

After noting that Plaintiff, a school-age child, had not engaged in substantial gainful activity since the date his application was filed, September 12, 2011, the ALJ concluded that he had severe impairments of ADHD, combined type; ODD; and circadian rhythm sleep disorder. (Id. at 14.) He did not have an impairment or combination of impairments that met or medically or functionally equaled an impairment of listing-level severity. (Id.)

In reaching this conclusion, the ALJ summarized the record, including Plaintiff's, Mr. Johnson's and a brother's reports; the medical records; and the educational records. (Id. at 15-21.) He noted that Plaintiff's mental status examination findings were generally of normal behavior and that his symptoms worsened when he was not compliant with his medications. (Id. at 16-17.) Plaintiff tolerated the medication for his circadian rhythm disorder well and there were infrequent changes to the dosages. (Id. at 17.) Although Plaintiff had had frequent disciplinary actions, he had no IEP and no specialized remedial measures had been taken other than to isolate him and seat him close to the teacher. (Id.) The ALJ gave "some weight" to the questionnaire responses of Ms. Epter, Ms. Odom, and Ms. Doyle, finding them to be consistent with the medical records; "little weight" to the responses of Mr. Blase based, in part, on the lack of personal observations and to those of Mr. Skeen, based on his limited interaction with Plaintiff and his failure to address those periods when Plaintiff was functioning adequately; and "no weight" to Clinton Johnson's responses, finding them to be inconsistent with the medical evidence. (Id. at 19-20.)

The ALJ then assessed the degree of limitation Plaintiff has in the various domains, finding that Plaintiff has no limitation in acquiring and using information, in moving about

and manipulating objects, and in health and physical well-being; less than marked limitations in interacting and relating with others and in caring for himself; and marked limitations in attending and completing tasks. (Id. at 20-27.) Relevant to the domain of interacting and relating with others, Plaintiff had friends his own age, could make new friends, and had normal speech. (Id. at 23-24.) His behavior improved when he was taking his medications. (Id.) Relevant to the domain of caring for himself, was Plaintiff's lack of physical problems. (Id. at 25.) Although Plaintiff had some problems, e.g., problems in concentration, focusing, and being defiant, his personal hygiene was generally fine, he could get to school on time when he was compliant with his medications, he avoided accidents, and he asked for help when it was needed. (Id.)

Consequently, because Plaintiff did not have an impairment or combination thereof that caused marked limitations in two domains or an extreme limitation in one, he was not disabled within the meaning of the Act. (Id. at 27.)

### Legal Standards

Title 42 U.S.C. § 1382c(a)(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for the purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

Under the Act,

> [t]he ALJ employs a three-step sequential process to determine whether a child is disabled. First, the ALJ determines if the child is engaged in a substantial gainful activity. 20 C.F.R. § 416.924(b). Second, if the child is not working, the ALJ determines if the child has "a medically determinable impairment(s) that is severe." § 416.924(c). And third, if the ALJ finds that the child's impairment is severe, the ALJ must then determine whether the impairment or combination of impairments meets or medically equals the severity of a listed impairment described in 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 416.924(d). If the ALJ finds that the child's impairment does not meet or medically equal the severity of a listed impairment, the child may still be disabled if the ALJ determines that the impairment(s) functionally equals the severity of a listed impairment. Id.

Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008). Accord Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004). At the third step,

> a child's impairment is functionally equal to a listed impairment if there is an "extreme" limitation in one of six specific functional domains, or a "marked" limitation in at least two domains. 20 C.F.R. § 416.926a. Domain analysis considers the child's age-appropriate functioning in relation to: acquiring and using information, attending and completing tasks, interacting and relating with others, moving around and manipulating objects, caring for oneself, and health and physical well being. 20 C.F.R. § 416.926a(a)(1)(i)-(vi).

Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 854 (8th Cir. 2003).

The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. Neal, 405 F.3d at 688 (8th Cir. 2005); Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1152 (8th Cir. 2004). "'Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's decision.'" Neal, 405 F.3d at 688 (quoting Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998)). It is "more than a scintilla of evidence." Id.

When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account whatever in the record fairly detracts from that decision. **England v. Astrue**, 490 F.3d 1017, 1019 (8th Cir. 2007). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Id.**

### Discussion

Plaintiff argues that the ALJ erred by not finding he had marked limitations in the domains of interacting and relating with others and of caring for himself. The Commissioner disagrees.

"A marked limitation in a domain is a limitation that seriously interferes with a child's ability to 'independently initiate, sustain, or complete activities.'" **England**, 490 F.3d at 1020 (quoting 20 C.F.R. § 416.926a(e)(2)(i)). "A marked limitation is 'more than moderate' but 'less than extreme.'" **Id.** (quoting § 416.926a(e)(2)(i)). Although not defined in the Title XVI regulations, "moderate" is defined in the dictionary as "[o]f medium or middling quality, size, or extent . . . . ." Oxford English Dictionary, http://www.oed.com/view/Entry/120600? (last visited July 27, 2015).

"In the domain of interacting and relating with others, how well a child "initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of his community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others" is considered. 20 C.F.R. § 416.926a(i). "Interacting means initiating and responding to exchanges with other people,

for practical or social purposes."  20 C.F.R. § 416.926a(i)(1)(i).  "Relating to other people means forming intimate relationships with family members and with friends who are [the child's] age, and sustaining them over time."  20 C.F.R. § 416.926a(i)(1)(ii).  To interact and relate, a child must, among other things, "respond appropriately to a variety of emotional and behavioral clues," "participate in verbal turntaking and nonverbal exchanges; consider others' feelings and points of view; follow social results for interaction and conversation; and respond to others appropriately and meaningfully."  20 C.F.R. § 416.926(i)(1)(iii).  Children of Plaintiff's age[7] should "[a] be able to initiate and develop friendships with children" of the same age; "[b] relate appropriately to other children and adults, both individually and in groups"; "[c] begin to be able to solve conflicts between [ones] self and peers or family members or adults outside [one's] family"; [d] "recognize that there are different social rules for [ones self] and [one's] friends and for acquaintances or adults"; and "[e] be able to intelligibly express [one's] feelings, ask for assistance in getting [one's] needs met, seek information, describe events, and tell stories . . . ."  20 C.F.R. § 416.926a(i)(2)(v).  "Important aspects of both interacting and relating are the child's response to persons in authority, compliance with rules, and regard for the possessions of others."  Social Security Ruling 09-5p, 2009 WL 396026, *2 (S.S.A. 2009).  "Children with impairment-related limitations in this domain may be disruptive; therefore, their limitations may go unnoticed.  Such children

---

[7]Plaintiff was 13 years old at the time of the hearing and decision.

may be described as socially withdrawn or isolated, without friends, or preferring to be left alone." Id.

The ALJ determined that Plaintiff had less than marked limitations in the domain of interacting and relating with others, citing his ability to make friends his own age, his normal speech, and the improvement in his behavior when on medication. Informing his determination were, in addition to Plaintiff's and Mr. Johnson's testimony, the various teachers's questionnaire responses and Dr. Derlukiewicz' records. Plaintiff argues that Ms. Epter's responses, e.g., rating Plaintiff as having no limitations in the domain of interacting and relating with others, was given too much weight while those of Mr. Blase, Ms. Odom, and Mr. Skeen were given too little.

Plaintiff correctly notes that Ms. Epter's responses were made after knowing Plaintiff for three months (August, September, and October 2011) and teaching him and twenty-seven other students ninety-minutes a day. Ms. Odom knew Plaintiff one month longer – from August to December 2011. Mr. Blase, a school counselor, qualified his responses by explaining that he had not observed the reported behaviors but had been told of them. Mr. Skeen is a director of transportation; the basis for his knowledge of Plaintiff's behavior is not explained. Mr. Skeen did report that Plaintiff's behavior – which had been a problem for years – improved when he took his medications. This report is consistent with the medical records of Dr. Derlukiewicz. She began seeing Plaintiff in July 2010 and saw him fairly regularly up to March 2011. At the February 2011 visit, Plaintiff's brother described him as doing better at home and at school. His father made the same observation in March.

Although Plaintiff was to return in one month, it was six months before he next saw Dr. Derlukiewicz. His father informed her at that, September 2011 visit that he was applying for disability for Plaintiff. Dr. Derlukiewicz talked with Plaintiff and his father about keeping the monthly appointments and also prescribed an increased dosage of the ADHD medication to "subside" Plaintiff's symptoms. (R. at 315.) Plaintiff and his father did return in one month, but Plaintiff was only taking his medication three out of seven days and Mr. Johnson was giving him the clonidine at the wrong time. Again, Plaintiff and his father kept the next monthly appointment, but Plaintiff was continuing to forget to take the medication, both at home and at school. Mr. Johnson was continuing to give Plaintiff the clonidine at the wrong time. At the December visit, there was reported improvement in Plaintiff's medication compliance. Dr. Derlukiewicz noted that one of Plaintiff's teachers reported a lot of behavior and defiance issues, but opined that the issues might have arisen with Plaintiff was noncompliant with his medication and Mr. Johnson was noncompliant with instructions on when Plaintiff should be taking clonidine. This correlation between Plaintiff's behavior at home and at school and the degree of compliance with medications is reflected in Mr. Johnson's observation to Dr. Derlukiewicz in April 2012 that Plaintiff was doing well in both environments as long as he took his medications and in Plaintiff's decrease in grades the next December when he was not compliant.

As the foregoing illustrates, the questionnaire responses of the teachers, counselor, and transportation director were given during a time when Plaintiff had resumed seeing Dr. Derlukiewicz after a *six*-month absence but continued to be noncompliant with taking his

medications as prescribed. Plaintiff argues, however, that Social Security Ruling 09-7 forbids the denial of benefits to a child based on his failure to follow prescribed treatment.

The footnote cited by Plaintiff explains that the Commissioner "do[es] not consider a child fully responsible for failing to follow prescribed treatment. Also, the policy of failure to follow prescribed treatment does not apply unless [the Commissioner] first find[s] that the child is disabled. . . . [I]f there is not a good reason [for failure to follow the prescribed treatment] and all the other requirements are met, a denial based on failure to follow prescribed treatment would be appropriate." Title XVI: Determining Childhood Disability – the Functional Equivalence Domain of "Caring for Yourself", S.S.R. 09-7p, 2009 WL 396029 *6 n.11 (S.S.A. Feb. 17, 2009). This note is made when explaining that a child's frequent failure or refusal to take prescribed medication is evaluated under the domain of caring for oneself. Id. Moreover, the consideration of why a child refuses to take prescribed medication is reached *after* the Commissioner finds that the child is disabled.

In the instant case, the ALJ found that Plaintiff was not disabled. Plaintiff's noncompliance with medication was properly considered in the context of its relation to his behavior and defiance issues. The record, including Dr. Derlukiewicz's office notes and statements by Mr. Johnson, support the ALJ's conclusion that, when complaint, Plaintiff has a less than marked limitation in the domain of interacting and relating with others. Indeed, Dr. Derlukiewicz's functional capacity assessment of Plaintiff explicitly relates his problems in the domain of interacting and relating with others to his not being compliant with his

medications.[8]   The regulations provide that the effect of medications is relevant to the assessment of a child's functional limitations, see 20 C.F.R. § 416.926a(a)(3), and that a child must follow prescribed treatment "if the treatment can reduce [his] functional limitations so that they are no longer marked and severe," 20 C.F.R. § 416.930(a).  The Eighth Circuit has held that "[i]mpairments that are controllable or amenable to treatment do not support a finding of total disability."  **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999); Accord **Scales v. Barnhart**, 363 F.3d 699, 705 (8th Cir. 2004).  Thus, the denial of SSI benefits has been affirmed when a child's ADHD and behavior problems improve with medication.  See **Briggs v. Callahan**, 139 F.3d 606, 609 (8th Cir. 1998).  See also **Collins ex rel. Williams v. Barnhart**, 335 F.3d 726, 730 (8th Cir. 2003) (holding that ALJ had not erred in finding that claimant with ADHD did not have marked limitations in social functioning; child's behavior had been disruptive, not incapacitating, and how well he was functioning depended on whether he was on medication); **N.R.R. ex rel. Davenport v. Astrue**, 2013 WL 1090397, *6 (E.D. Mo. Mar. 15, 2013) (holding in child ADHD case that "[i]t is proper for an ALJ to consider whether a claimant's impairments can be treated with medication when determining whether a claimant has an impairment in a functional equivalence domain");  **Dorey ex rel. A.M.D. v. Colvin**, 2015 WL 3895152, *2-3 (W.D. Ark. June 24, 2015) (affirming ALJ's decision finding no limitations in interacting and relating with others when claimant was able to interact appropriately when compliant with treatment plan).

---

[8]This same conclusion is drawn in connection with Plaintiff's functioning in the domain of caring for himself, as discussed below.

Plaintiff also challenges the ALJ's finding that he does not have marked limitations in the domain of caring for oneself.

"The domains of 'Caring for yourself' and 'Interacting and relating with others' are related, but different from each other. The domain of 'Caring for yourself' involves a child's feelings and behavior in relation to self (as when controlling stress in an age-appropriate manner). The domain of 'Interacting and relating with others' involves a child's feelings and behavior in relation to other people (as when the child is playing with other children, helping a grandparent, or listening carefully to a teacher)." S.S.R. 09-7p, 2009 WL 396029 *4.

As noted above, see note 8, supra, Dr. Derlukiewicz reported that Plaintiff had marked limitations in this domain when he was not compliant with his medications.[9] As discussed above, Plaintiff's compliance with prescribed treatment is relevant to a consideration of his limitations in this domain. The office notes of Dr. Derlukiewicz consistently describe Plaintiff as well-dressed and groomed, with a logical and goal-directed thought process, and with insight and judgment adequate to his age. And, the ALJ found he asked for help when needed and avoided accidents.

Plaintiff argues that he has marked limitations caused by his sleep disorder, which makes it difficult for him to get the sleep necessary for him to function. As noted by the Commissioner, however, Plaintiff's sleep disorder is amenable to treatment. The record

---

[9]Examples of marked limitations in this domain include a child not dressing of bathing himself appropriately, engaging in self-injurious behavior, ignoring safety rules, or placing non-nutritive or inedible objects in his mouth. 20 C.F.R. § 416.926a(k)(3)(i), (iii), (iv). See also **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 652 (8th Cir. 2004) (citing examples given in regulations of actions indicative of ability to care for oneself).

reflects that his difficulties with sleeping arose at a time when his father was giving him the prescribed medication too early in the evening, causing Plaintiff to wake up in the middle of the night.

### Conclusion

"'The claimant bears the burden of proving disability.'" **Whitman v. Colvin**, 762 F.3d 701, 705 (8th Cir. 2014) (quoting Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011)). Although Plaintiff articulates why a different conclusion might have been reached, he has not carried his burden of showing that the ALJ's decision was "outside the zone of choice," **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of July, 2015.